# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 22-0432V

| | |
|---|---|
| ANTOINETTE HARRIS, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: April 23, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David Alexander Tierney*, Rawls Law Group, Richmond, VA, *for Petitioner.*

*Catherine Elizabeth Stolar*, U.S. Department of Justice, Washington, DC, *for Respondent.*

### **FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM**[1]

On April 13, 2022, Antoinette Harris filed a Petition under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"); *see* Section 11(c)(1)(D)(i). Petitioner alleges that she suffered a left-sided shoulder injury related to vaccine administration ("SIRVA") following her receipt of an influenza ("flu") vaccine on October 8, 2020. Petition (ECF No. 1). The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the following reasons, I conclude that under the Act's "more likely than not" standard, the at-issue vaccination was left-sided, and that vaccination was followed within 48 hours by new shoulder pain. However, calcific tendinitis is a potential alternative explanation for her symptoms, requiring dismissal of her Table SIRVA claim (although a causation-in-fact claim remains tenable).

## I. Relevant Procedural History

After the case was assigned to SPU, Respondent promptly noted that the contemporaneous vaccine administration records suggested that Petitioner's non-injured arm received the vaccine in question. ECF No. 13. Petitioner maintained in response that those records represented "merely clerical error." ECF No. 20. She also filed medical records and several affidavits at Exs. 1 – 13. The parties did not report any settlement discussions.

In the Rule 4(c) Report filed on November 21, 2023, Respondent argued that Petitioner could not establish the situs, onset, and absence of potential alternative explanations required to make out a Table SIRVA. ECF No. 28. In January 2024, Petitioner was ordered to show cause why that claim should not be dismissed, and to ensure that the evidentiary record was complete. ECF No. 30. Petitioner completed her filings eight months later, *see* Exs. 14 – 22; Brief filed Sept. 23, 2024, ECF No. 48, but Respondent maintained a defensive posture. Response filed Dec. 12, 2024, ECF No. 50; Reply filed Jan. 10, 2025, ECF No. 52. The matter is now ripe for adjudication.

## II. Authority

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner

may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## III. Evidence

I have reviewed the complete record (including all exhibits, the Petition, the Rule 4(c) Report, and both parties' briefing), and highlight the following:

### A. Medical Records

Petitioner was born in 1966. In or around 2006, she was diagnosed with right-sided breast cancer, prompting a mastectomy with axillary lymph node dissection. Ex. 8 at 7. By 2020, she was "doing well from a cancer perspective." *Id.* at 8. Her left arm was the situs for at least four previous vaccinations, including a flu vaccine administered in December 2019. Ex. 4 at 46 – 47. Petitioner is right-handed. *See, e.g.*, Ex. 4 at 50; Ex. 7 at 22.

On October 8, 2020, Petitioner received a flu vaccine. Both a handwritten notation, and a corresponding computerized record, indicate a right-sided administration. Ex. 3 at 3, 5. The vaccine was administered by a CVS pharmacist at Petitioner's workplace in the state of South Carolina. Response at 2; Ex. 21 at 1 – 3.

Fifty-two (52) days later (November 29, 2020), Petitioner reported at an urgent care facility that she had been experiencing "left shoulder pain x2 months" that "began after she got a flu shot in the left arm at work." Ex. 4 at 50. "[T]he pain ha[d] been waxing and waning in intensity. For the most part it did 'ease up' [then…] became worse this past 1 week and much worse the past 2 days." *Id.* The pain had been temporary relieved with

4

Tylenol and gabapentin,[4] but currently rated 10/10. *Id.* A physical exam found tenderness to palpation and restricted range of motion ("ROM"). *Id.* at 51.

In addition, an x-ray was performed of the relevant left shoulder, and it found "1. Normal alignment of the left shoulder with no fracture. 2. Calcific deposits in the soft tissues overlying the left shoulder, *which can be seen in the setting of calcific tendinitis*. 3. Mild left acromioclavicular osteoarthritis." Ex. 4 at 51 (emphasis added). The urgent care physician provided a five-day prescription for prednisone, an arm sling, and a work excuse letter. *Id.*[5] But the physician's assessment was of non-specific "left arm pain," and he encouraged further evaluation by an orthopedist if the injury continued. *Id.*

A December 2, 2020 telephone encounter record reflects an oncology nurse's encouragement of ongoing "vigilan[ce] on self breast exams," and Petitioner's report that "her left shoulder had been bugging her ever since she got her flu shot a month ago." Ex. 8 at 18.[6]

On December 3, 2020, Petitioner informed her primary care physician ("PCP") that after receiving a flu vaccine in her left arm at work, she experienced "immediate discomfort," which she initially assumed was normal. Ex. 5 at 581. But "over the last 2 weeks," her left shoulder pain and stiffness had progressed. *Id.* On exam, the shoulder was "exquisitely tender," with limited ROM (specifically only 90 degrees of extension). *Id.* The PCP suggested that the flu shot had "infiltrated the subacromial bursa" causing bursitis. *Id.* at 582. She prescribed hydrocodone and meloxicam to help manage the inflammation, and referred Petitioner for an orthopedic evaluation. *Id.*[7]

Also on December 3, 2020, Petitioner similarly reported (in the context of her initial orthopedic evaluation) that after receiving a flu vaccine at work, she had suffered "on and off pain over the past couple of months which was significantly increased over the past 5 or 6 days." Ex. 6 at 10 – 11. Physical examination and review of the prior x-rays led to an

---

[4] The gabapentin was previously prescribed by her PCP for chronic back pain, *see* Ex. 5 at 539 – 40.

[5] Petitioner began a leave of absence from her job (as a bank teller) on November 30, 2020. Ex. 18 at 250.

[6] As noted above, the flu shot was actually nearly *two months* prior to the December 2, 2020 telephone call, on October 8, 2020.

[7] *See also* Ex. 5 at 603 – 605 (December 10, 2020 telemedicine follow-up regarding the ongoing left shoulder injury, with a primary care physician's assistant). Of note in December 2020, the primary care providers did not record any knowledge or review of the preceding urgent care encounter with x-ray findings including calcific tendinitis.

5

assessment of calcific tendinitis "possibly aggravated by the flu shot," prompting a subacromial steroid injection on December 3, 2020. *Id.* at 11.[8]

Two weeks later, Petitioner reported "minimal relief" from her treatment to date. An orthopedics physician's assistant ("PA") reviewed the x-rays, maintained the assessment of calcific tendinitis, prescribed Voltaren, and entered a referral to physical therapy ("PT"). Ex. 6 at 8; Ex. 7 at 18.

The December 17, 2020 PT initial evaluation record states that Petitioner's left shoulder's onset was in "October 2020," and was "insidious… worsened after getting a flu shot at work." Ex. 7 at 22. The therapist assessed that Petitioner's "clinical presentation [was] consistent with calcific tendinitis," adding: "No adhesive capsulitis is appreciated today considering ROM loss is not global and is not present with P [passive] ROM." *Id.* at 23. PT did not deliver significant improvement, however.[9]

On January 18, 2021, an MRI of Petitioner's left shoulder yielded impressions of "subacromial/ subdeltoid bursitis… rotator cuff tendinopathy without full-thickness tear or retraction [and…] and cystic resorptive changes." Ex. 20 at 2.[10] Later that same month, on January 22, 2021, Petitioner's physical therapist opined that the "MRI results show[ed] mild tendinopathy without mention of calcific lesions and mainly show bursal irritation/ fluid accumulation." Ex. 7 at 86.

In contrast, during a January 25, 2021 follow-up appointment, Petitioner's PCP opined that the MRI *did* show calcific tendinitis, which likely explained her shoulder pain as well as adhesive capsulitis. Ex. 5 at 653 - 54. The PCP added: "It is unclear if this was precipitated by her flu vaccine but certainly possible if it was given into her bursa." Ex. 5 at 654; *see also* Ex. 7 at 136 (subsequent PT record, documenting that another provider – likely the PCP – "said that the MRI confirms the calcific tendonitis").

---

[8] Petitioner states that the December 3, 2020, orthopedic initial evaluation was recorded by an individual who was apparently not yet a physician's assistant ("PA"), because he is also identified as "MS" (presumably an abbreviation for medical student). Brief at 5, citing Ex. 6 at 11. But *different* orthopedic PAs, and physicians, independently reviewed the x-rays while evaluating Petitioner, and rendered the same assessment of calcific tendinitis. *See, e.g.*, Ex. 6 at 8; Ex. 7 at 18; Ex. 5 at 700, 705.

[9] *See generally* Ex. 7 (PT records); *see also* Ex. 8 at 7 – 10 (December 28, 2020 oncology appointment noting left shoulder injury); Ex. 5 at 635 – 37 (December 31, 2020 PCP encounter again noting left shoulder injury).

[10] The MRI had been suggested by an orthopedics urgent care PA on December 16, 2020. Ex. 6 at 8. The MRI was ordered several weeks later, by Petitioner's longtime oncologist. Ex. 8 at 9.

At a January 27, 2021 initial evaluation, a sports medicine physician recorded Petitioner's report of receiving "her influenza vaccine in October in the left arm," followed by "pain in the shoulder [which…] persisted long afterwards, and by November she was having more severe pain…" Ex. 5 at 675. The sports medicine physician reviewed that the past x-rays had "showed some calcification in the soft tissue." *Id.* The MRI found "subacromial bursitis and rotator cuff tendinosis," but did "not visualize" calcific tendinitis." *Id.* at 675, 679. A second subacromial steroid injection was administered. *Id.* at 705.

At Petitioner's eleventh and apparently final PT session on February 9, 2021, she received repeat education about her assessed calcific tendinopathy. Ex. 7 at 149 – 50. There is no formal discharge summary, but the evidence suggests that Petitioner continued regular home exercises. *Id.*; Ex. 5 at 722.

On February 17, 2021, the sports medicine physician and the PCP each noted that Petitioner had improved since the recent steroid injection. Ex. 5 at 700 – 705, 722 – 23.

On March 10, 2021, the sports medicine physician administered a third and hopefully final, subacromial steroid injection and encouraged Petitioner to follow up as needed, Ex. 5 at 741 (but no further appointments with this physician are in the record). By the end of March, the PCP recorded that Petitioner's "calcific tendinitis and adhesive capsulitis" had "persisted despite injections and physical therapy," and further orthopedic evaluation was warranted. Ex. 5 at 766 – 67.[11]

At a May 10, 2021 initial evaluation, an orthopedist[12] opined that the prior MRI "demonstrate[d] significant inflammatory response and calcific tendinopathy anteriorly." Ex. 6 at 4. The MRI, a physical examination that day, and Petitioner's report of "overall symptoms [but…] not quite back to her baseline" informed an assessment of: "Resolving left shoulder inflammatory response to calcific tendinopathy." *Id.* The orthopedist explained that a potential future surgical intervention would likely include "extensive debridement of the subacromial space with excision of calcific deposit" as well as shoulder manipulation, capsular release, and biceps tenotomy or tenodesis. *Id.* But the orthopedist would require "repeat x-rays… to evaluate for partial resorption of the calcific deposit" to fully evaluate the propriety of surgery. *Id.*

---

[11] *See also* Ex. 5 at 798 – 99, 824 (Spring 2021 PCP records reflecting that Petitioner planned to receive further vaccinations in her thigh due to her "history of vaccine injury in her left arm and breast cancer with lymph node dissection in her right arm"); *accord* Ex. 12 at 200, Ex. 4 at 46 (corroborating this practice.)

[12] Petitioner was previously evaluated by physician assistants (PAs) at this practice, but May 10, 2021 marked her first direct evaluation by an orthopedic *physician.*

Petitioner's left shoulder injury persisted, but she was "afraid" to undergo corrective surgery. Ex. 12 at 116. Her PCP maintained a diagnosis of calcific tendinitis (and also endorsed potential vaccine causation thereof). *See, e.g.*, Ex. 12 at 166, 87, 21, 8; Ex. 14 at 63, 47, 33; Ex. 18 at 798 (listed chronologically). The PCP also noted that the injury was possibly exacerbated by a motor vehicle accident ("MVA") occurring in August 2022. *See, e.g.*, Ex. 12 at 21, 8.[13]

On January 25, 2023, Petitioner returned to the same orthopedics practice for reevaluation. An orthopedist reviewed her history of left shoulder pain beginning with a flu shot, "on and off… since," with an "acute flare over the past couple of months." Ex. 15 at 6. The orthopedist recorded that the 2021 MRI showed no rotator cuff tear, but a "prominence of calcific tendinitis" at that time. *Id.* at 9. The January 25, 2023 orthopedic appointment included repeat x-rays, and the findings were limited to a "prominence of the greater tuberosity" and a type two acromion. *Id.* at 8. The orthopedist assessed impingement and mild adhesive capsulitis, for which he administered Petitioner's fourth subacromial steroid injection. *Id.* at 9. Nine months later, the orthopedist administered a *fifth* steroid injection and raised the possibility that she was "progress[ing] to a rotator cuff tear." *Id.* at 1 – 5.

Finally, in 2023 two additional orthopedists (at the behest of the company making long-term disability payments to Petitioner) independently reviewed the medical records and concurred with the assessment of calcific tendinitis. Ex. 18 at 667 – 83, 828 – 33.

## B. Additional Evidence

Petitioner maintains that the flu vaccine she received in October 2020 was administered in her left deltoid, contrary to the most contemporaneous records. Ex. 11 at 1. She describes pain beginning "later that day," was not relieved by conservative measures (ice, heat, pain medications), and particularly worsened on Saturday, November 28, 2020, at which point her daughter encouraged her to seek urgent care. Ex. 1 at 1.[14] Petitioner's adult son concurred that her arm was severely painful and difficult to move by "the morning after receiving the vaccine," and has disrupted her interactions with her first grandchild (who was born in either late 2020 or early 2021). Ex. 2 at 1.

---

[13] Petitioner has not filed records of an apparent emergency/acute evaluation and PT prompted by her August 2022 MVA.

[14] *See also* Time and Date, https://www.timeanddate.com/calendar/monthly.html?year=2020&month=11&country=1 (confirming that the "last Saturday of the month," referenced by Petitioner, was November 28, 2020).

In March 2024, Petitioner's long-time oncologist wrote a letter stating that Petitioner should not receive "any injections in the right arm" – without any further context. Ex. 19 at 1. Finally, Petitioner cited the American Cancer Society's explanation that at least *COVID-19* vaccinations can result in swollen lymph nodes under the arm in which the injection was given. The American Cancer Society states: "Because a swollen lymph node under the arm can also be a sign of breast cancer, most doctors recommend that people with breast cancer or a history of breast cancer get the injection in the arm on the opposite side of your breast cancer."[15]

## IV. Findings of Fact and Conclusions of Law

### A. Vaccine Administration Site

A petitioner asserting a Table SIRVA bears the burden of establishing the site of vaccine administration. Section 11(c)(1); 42 C.F.R. § 100.3(c)(10)(iii) (referring to "the shoulder *in which the* intramuscular vaccine *was administered*") (emphasis added).

Based on my experience with SIRVA cases (over 2,000 within SPU since my appointment as Chief Special Master, additional cases handled within chambers, and review of opinions issued by other special masters), I deem it not unusual for vaccine administration site information to be inaccurately recorded – especially within electronic records. Handwritten notations of situs, by contrast, are generally deemed to be more reliable[16] - but they too are capable of being rebutted by other evidence.[17]

Here, the contemporaneous records – one handwritten notation, then formalized electronically – suggest a right-sided vaccine administration. But Petitioner has established that those records are likely to be incorrect. First, when she presented to healthcare providers regarding her left shoulder pain, she consistently attributed the pain to a left-sided vaccination. *See, e.g.*, Ex. 4 at 50; Ex. 5 at 581, 675. Such patient histories

---

[15] American Cancer Society, *COVID-19 Vaccines in People with Cancer*, https://www.cancer.org/cancer/managing-cancer/coronavirus-covid-19-and-cancer/covid-19-vaccines-in-people-with-cancer.html (last accessed Apr. 22, 2025), cited in Brief at 13.

[16] *See, e.g.*, *Schmidt v. Sec'y of Health & Hum. Servs.*, No. 17-1530V, 2021 WL 5226494, at *8 (Fed. Cl. Spec. Mstr. Oct. 7, 2021); *Marion v. Sec'y of Health & Hum. Servs.*, No. 19-0495V, 2020 WL 7054414 at *8 (Fed. Cl. Spec. Mstr. Oct. 27, 2020); *Daugherty v. Sec'y of Health & Hum. Servs.*, No. 15-1919V, 2024 WL 3416068, at *5 – 6 (Fed. Cl. Spec. Mstr. June 5, 2024).

[17] *See, e.g.*, *Rizvi v. Sec'y of Health & Hum. Servs.*, No. 21-0881V, 2022 WL 2284311 at * 3 (Fed. Cl. Spec. Mstr. May 13, 2022); *Toothman v. Sec'y of Health & Hum. Servs.*, No. 22-0207V, 2024 WL 2698520, at *4 (Fed. Cl. Spec. Mstr. Apr. 19, 2024); *Supernaw v. Sec'y of Health & Hum. Servs.*, No. 20-1517V, 2024 WL 3739291 at *5 – 6, (Fed. Cl. Spec. Mstr. July 10, 2024); *Porter v. Sec'y of Health & Hum. Servs.*, No. 22-389V, 2024 WL 4490586 (Fed. Cl. Spec. Mstr. Sept. 9, 2024).

"in general, warrant consideration as trustworthy evidence… [as they] contain information supplied to… health professionals to facilitate diagnosis and treatment," *Cucuras*, 993 F.2d at 1528, despite the initial 52-day treatment delay.

The evidence also reflects that Petitioner typically received vaccinations in her left arm. Ex. 4 at 46 – 47. She explains that preference was due to her history of right-sided breast cancer. *See, e.g.*, Ex. 5 at 799; Ex. 19 at 1; Brief at 13 – 14 (citing American Cancer Society webpage).[18] Finally, Petitioner is right-handed, Ex. 4 at 50, and many individuals tend to prefer vaccination on the non-dominant side.[19] In sum, the weight of the evidence, along with and particularized circumstances established based on the record of this case, preponderantly establish that the October 8, 2020 vaccination was likely administered in Petitioner's left shoulder.

### B. Onset

A Table SIRVA claim also requires proof of onset of shoulder pain within forty-eight (48) hours of vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii). As an initial matter, I note that Petitioner's 52-day initial treatment delay,[20] and the characterizations of pain occurring "after" or "since" vaccination,[21] mirror the evidence in many other SIRVA claims which have been found entitled to compensation – especially when the evidence does not support a specific alternative onset.

Respondent argues that the record establishes only "transient" post-vaccination shoulder pain, which "likely abated and did not return until one to two weeks before" her November 29, 2020 urgent care encounter. Response at 11 – 12. But review of the records suggests that Petitioner described pain as fluctuating in intensity, but then *significantly* worsening in late November. She did not describe any truly *pain-free* period prior to that point. *See, e.g.*, Ex. 4 at 50 ("left shoulder pain x2 months… after she got a flu shot"); Ex. 8 at 18 ("ever since" the vaccination); Ex. 5 at 675 ("persisted long

---

[18] *Accord Fletcher v. Sec'y of Health & Hum. Servs.*, No. 20-0127V, 2023 WL 6214983, at *4 – 5 (Fed. Cl. Spec. Mstr. Aug. 16, 2023) (accepting another petitioner's "cogent explanation" that she received a vaccination in the arm opposite to her prior breast cancer and radiation treatment).

[19] *See, e.g.*, *Rizvi*, 2022 WL 2284311 at * 3; *Edmonds v. Sec'y of Health & Hum. Servs.*, No. 20-1635V, 2025 WL 1089632, at *3 (Fed. Cl. Spec. Mstr. Mar. 7, 2025).

[20] "It is common for SIRVA claimants to delay treatment, thinking his/her injury will resolve on its own…" *Sullivan v. Sec'y of Health & Hum. Servs.*, No. 21-2341V, 2024 WL 2290012, at *6 (Fed. Cl. Spec. Mstr. Apr. 16, 2024), cited in Brief at 10, 13 – 14.

[21] Within the Program, such terms are typically understood to "mean *very* close in time – immediately, or at most within a day or two" after vaccination. *Flowers v. Sec'y of Health & Hum. Servs.*, No. 20-285V, 2024 WL 2828211, at *11 (Fed. Cl. Spec. Mstr. May 8, 2024), *mot. for rev. den'd*, 173 Fed. Cl. 613 (2024).

afterwards"); *accord* Ex. 1 at 1 (Petitioner recalling that she "still" experienced pain throughout October and November 2020).

Respondent also argued that "there is no evidence that SIRVA can occur intermittently or in a suddenly worsening manner as described here." Rule 4(c) Report at 11 – 12; *see also* Response at n.5 (maintaining this objection). But the Table onset requirement only seeks evidence of pain *beginning* in the post-vaccination 48-hour timeframe. And the question of whether relapsing/waxing-waning pain makes an injury less likely to be a SIRVA does not bear on this issue. Accordingly, there is preponderant evidence to support an onset of shoulder pain within 48 hours of the vaccination.

### C. Other Condition or Abnormality

The final disputed SIRVA requirement is whether there is a condition or abnormality present that would explain Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(iv). This reflects an *affirmative* burden borne by petitioners (since they must meet all QAIs to obtain the benefits of a Table claim, where causation is presumed). As a result (and unlike in the context of a causation-in-fact claim), a SIRVA petitioner cannot evade this kind of evidence as easily as can be done in the non-Table context.[22]

In contesting this requirement, Respondent emphasizes the many medical record references to calcific tendinitis. Rule 4(c) Report at 11 – 13; Response at 13 – 14. And it does in fact appear that calcific tendinitis was the diagnostic consensus of Petitioner's treaters. *See, e.g.*, Ex. 4 at 51 (urgent care physician who obtained the first x-ray); Ex. 5 at 654 (PCP); Ex. 7 at 149 – 50 (physical therapist); Ex. 5 at 700, 705; Ex. 6 at 4, 8, 11; and Ex. 7 at 18 (various orthopedic PAs and physicians). Additionally, two independent orthopedic consultants reviewed the overall file and reached the same conclusion. Ex. 18 at 667 – 83, 828 – 33. This consensus was maintained despite the January 2021 MRI that *did not* visualize calcific lesions (a fact emphasized by Petitioner). Accordingly, Petitioner's effort to cast doubt on the calcific tendinitis evidence, *see generally* Brief at 15 – 16, Reply at 4 – 6, is unpersuasive.

---

[22] *See, e.g.*, *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) at *14 (explaining that 42 C.F.R. § 100.3(c)(10)(iv), "it is petitioner herself that bears the burden of showing that any evidence of [the alternative condition] is not meaningful"); *Rance v. Sec'y of Health & Hum. Servs.*, No. 18-0222V, 2023 WL 6532401, at *29 (Fed. Cl. Spec. Mstr. Sept. 11, 2023) (citing *Durham*); *French v. Sec'y of Health & Hum. Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023) ("[T]his Table element does not impose on Respondent the obligation to prove an alternative cause, but instead merely that the record contains sufficient evidence of a competing explanation to 'muddy' a finding that vaccine administration was the cause."); *French*, 2023 WL 7128178, at n. 8 ("this Table element expressly requires the *petitioner* to show no other 'condition or abnormality'").

Respondent also correctly notes that evidence of calcific tendinitis can prevent individuals from establishing 42 C.F.R. § 100.3(c)(10)(iv). Response at 14.[23] Petitioner has not addressed this case law even in her Reply, and I conclude that the same outcome is mandated here. Accordingly, the fourth QAI requirement is not met, requiring dismissal of the Table SIRVA claim.

### Conclusion and Scheduling Order

In sum, although Petitioner has preponderantly established a left-sided vaccination, and the onset of shoulder pain within 48 hours of vaccination, a further SIRVA QAI is not met – and therefore the Table claim must be dismissed.

A causation-in-fact claim based on these facts, however, *might* be feasible – but Petitioner must examine past case law on the parsing of SIRVA-like claims where calcific tendinitis appears also to be present as an alternative explanation for injury. *See, e.g.*, *Molina*, 2024 WL 4223393 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (decision dismissing vaccine causation-in-fact claim after evaluating both parties' expert opinions – in part explaining that calcific tendinitis develops gradually and eventually "result[s] in painful bursitis"). It is reiterated that no experts are authorized at this time.

The parties are instructed to promptly explore the potential for informal resolution. If they cannot report a tentative settlement agreement within 60 days, the case will very likely be transferred out of SPU for further proceedings.

**Accordingly within 60 days, by no later than Monday, June 23, 2025, Petitioner shall file a Joint Status Report updating on the case,** unless a 15-Week Order has been requested by that deadline.

**IT IS SO ORDERED.**

                                                **s/Brian H. Corcoran**
                                                Brian H. Corcoran
                                                Chief Special Master

---

[23] Citing *Lindsey v. Sec'y of Health & Hum. Servs.*, No. 20-1650V, 2023 WL 4858539, at *8 - 9 (Fed. Cl. Spec. Mstr. June 29, 2023); *Smith v. Sec'y of Health & Hum. Servs.*, No. 20-0300V, 2023 WL 6620362, at *5 (Fed. Cl. Spec. Mstr. Feb. 24, 2023); *Molina v. Sec'y of Health & Hum. Servs.*, No. 20-0845V, 2022 WL 22758881, at *6 (Fed. Cl. Spec. Mstr. Sept. 14, 2022).